(81 South. 373)

No. 21605.

WIMBISH v. MAYER.

(Jan. 6, 1919.    Rehearing Denied March 3, 1919.)

· (Syllabus by the Court.)

1. ESTOPPEL ⚖＝94(2)—ESTOPPEL IN PAIS— AFFIRMATIVE REPRESENTATIONS.

Under our well-settled jurisprudence, where one stands by and sees his property sold under legal process, without making his claim known, or objecting thereto, he will be bound by the sale; and a fortiori does that rule apply against one who, by his affirmative representations, induces another to buy property to which he afterwards asserts a claim as owner.

144 LA.—28

2. EVIDENCE ⚖＝588 — EXTENT OF KNOWLEDGE—DETERMINATION.

It is ordinarily impossible for one person to know what may be within the memory and knowledge of another, and, in assuming to determine a question of that kind with reference to a person, not shown to be abnormal, a court must base its conclusion upon the common experience with normal individuals.

Appeal from Second Judicial District Court, Parish of Bossier; John N. Sandlin, Judge.

Action by C. B. Wimbish against Mrs. Mattie R. Mayer. From a judgment for plaintiff, defendant appeals. Judgment set aside, and judgment entered for defendant.

Joannes Smith, of Benton, and Elias Goldstein, of Shreveport, for plaintiff.

J. C. Pugh & Son, of Shreveport, for defendant.

### Statement of the Case.

MONROE, C. J. This is a petitory action in which plaintiff obtained judgment recognizing him to be the owner of:

"Lots 6 and 7, according to the survey and map of G. D. Alexander and J. M. Davies, surveyors, duly recorded, * * * lying and being within the traverse of Red Chute Lake, in the northwest quarter of section 5, township 16, range 12, and containing, in all, 41.50 acres, with all improvements thereon."

Defendant has appealed. She sets up title as having been acquired, through mesne conveyances, from plaintiff, and pleads an equitable estoppel:

It appears from the evidence that on January 10, 1911, plaintiff sold to Wetherbee & Johnson "the following described property" (omitting so much of the description as is impertinent to the issue here presented for decision), "to wit: The N. E. ¼ of the N. W. ¼ of section 5, and the E. ½, * * * containing 540 acres, more or less, and known as the 'Scopini place.' "

And on January 16, 1911, Wetherbee & Johnson sold the property, by the same de-

scription, to W. J. Brown. Thereafter, plaintiff was informed, by a Memphis company, holder of a mortgage, as we infer, that there was an error in the description, and that, instead of "N. E. ¼ of N. W. ¼ of section 5," it should read N. W. ¼ of section 5. He accordingly, as he testifies, proposed to Wetherbee to make the proper correction, and on April 22, 1911, he executed and recorded an instrument, signed by him alone, in which he declared:

"That, in transferring to G. W. Wetherbee and J. A. Johnson 540 acres of land, more or less, * * * known as the 'Scopini place,' * * * it was his intention to sell and convey all of the land purchased by him from the Farm Land Company, and that, in describing the portion of said land located in section 5, * * * as the N. E. ¼ of N. W. ¼ * * * there was an error on the part of the appearer, as his intention was to describe the land in section 5 as the fractional N. W. ¼ of said section 5, being that portion acquired by him from the Farm Land Company, but not including lots 6 and 7, bought from Thomas Caplis."

Wetherbee & Johnson, in the meanwhile (on January 16, 1911), had sold the property, by the original, erroneous, description, to W. J. Brown, and it does not appear that they, or Brown, ever saw the instrument that had been executed by plaintiff, or ever heard of the lots 6 and 7, which he had thereby assumed to reserve from the sale. It came to the knowledge of Brown, however, that an error had been committed, and that, as between plaintiff and Wetherbee and Brown, plaintiff had corrected it, and it seems probable that Wetherbee was entirely willing to make the correction, as between Brown and himself, but Johnson had disappeared, leaving no one to represent him. Early in 1912, therefore, Brown instituted a suit against Wetherbee & Johnson, alleging that the description in the conveyance, by them to him, "is erroneous, * * * in that it conveys the N. E. ¼ of the N. W. ¼ of section 5, instead of the N. W. ¼ of section 5," but

making no reference to lots 6 and 7. Plaintiff was not sought to be made a party to the suit, a curator ad hoc was appointed to represent Johnson, and Wetherbee, about that time (March 6, 1912), executed an instrument making what he and Brown seemed to consider the only correction that was required, to wit, the substitution of N. W. ¼ of section 5, in place of N. E. ¼ of N. W. ¼ of section 5. There was some delay in obtaining judgment in the suit thus instituted (which was still necessary as to the absent Johnson), and Brown was trying to negotiate a sale of the property to Mayer and Van Hoose, who employed Pugh & Fullilove to examine the title, which having done, those gentlemen reported against its acceptance, on the ground, as stated by Judge Pugh, in his testimony, that the title held by Brown called for only 40 acres in section 5, whereas the map which Brown had delivered to him showed that the "C. B. Wimbish Plantation" (being the property that was offered) included the whole of the N. W. ¼ of that section. In consequence of that objection and with a view to its removal, a meeting was convened at which there were present Messrs. Pugh & Fullilove and their clients, Mayer and Van Hoose, Mr. Prothro, who had brought the suit in behalf of Brown, Chas. S. Brown, son of W. J. Brown, who, for his father, had gone into possession of, and cultivated for two years, the property here in dispute, or part of it, Mr. Thigpen, who had given plaintiff some legal advice, and the plaintiff, and it was there agreed that the pending suit should be prosecuted to judgment; that plaintiff herein would go to court, if desired, and give his testimony in support of the demand therein set up, or which he understood to be set up; that Wetherbee should, so far as he was concerned, execute an instrument correcting the description in the act of conveyance which he and Johnson had executed, and, in consideration thereof, and of certain as-

surances given by the plaintiff herein, Mrs. Mayer and Mr. Van Hoose, then and there accepted the title. Those assurances were given in connection with a map which appears to have been made in 1910, by W. E. Martin, surveyor, and to have been delivered to Brown when he was negotiating for the purchase from Wetherbee & Johnson. It bears the legend "Approximate Map of C. B. Wimbish Plantation" (with some additional language), and shows as included in that plantation the whole of the N. W. ¼ of section 5, and the E. ½ and part of the W. ½ of section 6, there being added, within the ordinary inked lines, a red line which renders the boundaries of the property somewhat more conspicuous. Plaintiff, in giving

**The heavy line represents the red line referred to in the opinion.**

his testimony, was unable to recall that such a map was exibited at the meeting. Other witnesses gave the following, with other testimony, on that subject and concerning plaintiff's relation to the map, to wit: Mrs. Mayer testified that the map was exhibited; that plaintiff's attention was specifically call-

ed to it; and that she was given to understand that, in accepting the title, she would get all of the land therein delineated. Judge Fullilove says in his testimony:

"Judge Pugh stated to Mr. Wimbish that the use of the words 'All of the Scopini Plantation' would include that" (meaning of the whole of the N. W. ¼ of section 5), "and Mr. Wimbish agreed to it. I remember also his use of the phrase that 'Judge Pugh wanted the world with a fence around it.' There was absolutely no doubt of the assurance of Mr. Wimbish that all this was sold, and that all was being transferred to Mrs. Mayer and Gordon Van Hoose. The map was made by Mr. Martin. * * * Yes, we had this map, and Mr. Wimbish pointed out the property, even went so far as to include the batture property. There were some accretions. He pointed out this map as the property that he had transferred. * * * Q. Was not the error that Mr. Wimbish, according to your statement, agreed to correct, the error in the deed from Wetherbee & Johnson to Brown? A. I cannot remember positively. I remember simply the fact, as to when the error appeared, I cannot recollect, but I know that the property that was to be sold to Mrs. Mayer was the property shown on this map, and Mr. Wimbish's statement, or agreement, was to correct any error relating to that, so that the property would go to Mrs. Mayer and Gordon Van Hoose through this correction to that transfer. * * * Q. Mr. Fullilove, this map (indicating map filed in evidence) was followed up in writing by the deed to Mrs. Mayer? A. Yes, sir. Q. And Mr. Wimbish was present when that deed was written up? A. Yes, sir. Q. And is it not a matter of fact that he traced on these lines that it was all of that (indicating)? A. Yes, sir. Q. And the red lines represent the Wimbish property, delineated on the map? A. Yes, sir."

Charles S. Brown testifies that the map exhibited to him was the same that was delivered to him when his father bought the property. Being asked what trouble was about the description in the act of conveyance to his father, he replied:

"They" (Pugh & Fullilove) "said that, in the northwest quarter of section 5, three forties had been left out, by mistake, they claimed. * * * Q. State what was done and who was present when that error was found and a final agreement reached. A. We called in Mr. Wimbish,

and he came. Mr. Wetherbee brought them into the office of Pugh & Fullilove, * * * and they assured us that the correction would be made satisfactory. Q. Who assured you? A. Mr. Wimbish did. Mr. Wimbish laid this here map on the table, or desk, and ran around those lines himself, not once, but several times, and said, 'It is my intention to convey the entire tract in these bounds and all the land I own.' He repeated that several times. * * * Q. What was stated by us, in the presence of Mr. Wimbish, about that suit? A. Mr. Wimbish said that he would go to Benton himself to correct his part of it. I remember you told him—you told Mr. Wetherbee to come up and sign the statement. Mr. Wetherbee walked up and signed the statement correcting his part of it, and Mr. Wimbish assured us that he would settle his part of, and he marked off the pencil lines of this map, saying that he intended to convey the entire tract of land that he owned. * * * Q. Well, on whose assurance that the title would be corrected did Mrs. Mayer accept the title that day, rather than wait until judgment was signed? A. On the assurance of Mr. Wetherbee and Mr. Wimbish and, I suppose, the attorney that we had hired."

As we have stated, the act of correction executed by Wetherbee recites the error in the original conveyance by Wetherbee & Johnson, and declares that "in said title, the land situated in section 5 was erroneously described as the northeast quarter of the northwest quarter, whereas the correct description of the property intended to be conveyed in said section was the whole of the northwest quarter of section 5," and that its purpose is to correct that error. It was that error alone that was complained of in the petition filed, on behalf of Brown, on March 20, 1912. There was judgment (in order to reach Johnson) "correcting the description in the deed" (describing the deed) "so as to include and embrace the S. ½ and N. W. ¼ of section 5, * * * instead and in place of the N. E. ¼ of N. W. ¼ of section 5." It is conceded that there was an error in the judgment, in the inclusion of the S. ½ of N. W. ¼ of section 5, and that it would be corrected. The description in the conveyance from W. J. Brown to Mayer and Van Hoose includes the entire N. W. ¼ of section 5, and Van Hoose (on January 5, 1914) conveyed his interest in the property to Mrs. Mayer, by the same description.

It appears that the lots 6 and 7, here claimed by plaintiff, are located on the northwest edge of the N. W. ¼ of section 5, and that on April 10, 1909, they were sold by the sheriff of Bossier parish, under a writ of fieri facias, issued in the suit of Bossier Levee Board v. R. B. Childers, to Thomas Caplis, who, on the same day, sold them to the plaintiff herein, by the description which has been heretofore given and which includes the statement that they are stituated "in the N. W. ¼ of section 5," and contain 41.50 acres. It is said, by counsel, that the lots had been acquired by the levee board and sold to Childers, and that the sale by the sheriff was made in execution of a judgment which had been obtained for the price, which statement, we presume, is predicated upon the testimony of A. Lattier, a witness, called by plaintiff, since that is all that we find in the record upon the subject. The testimony appears to us to be somewhat confused; the witness at one time stating that the lots did not and at another time that they did, form part of the Scopini place. Our conclusion from it is that, according to the information of the witness, the lots once formed part of the bottom of a lake, which ran through the Scopini place, and upon a narrow strip of land on the border of which Scopini had his residence; that the lake went dry and the levee board claimed and got the land thus uncovered under some of the legislation on that subject, had it surveyed and divided into lots, and sold lots 6 and 7 to Childers, after which it passed to plaintiff, as heretofore stated. Lattier's cross-examination runs, in part, as follows:

"Q. So, up to that time, it had been known as part of the Scopini place? A. Afterwards, the levee board had it surveyed, but I knew it before as a lake. It had always been known

as the Scopini place, where his residence was. * * * Q. So it was always known as part of the Scopini place? A. It had always been known as a lake running through the Scopini place. * * * Q. And nobody knew any better until they made that survey? A. No, sir. * * * Q. You had always claimed it? A. I knew when I bought the land that it wasn't mine, but I thought it would be. Q. When did you first find out that Mr. Wimbish, over there, was nosing around, trying to claim that? A. I was casting around for a place to make a chicken farm and was talking to Mr. Wimbish, and he told me that he had that, and that it was over in front of the levee, and I told him, no, that it was right where I wanted it, and he told me that I could have it if I wanted it. Q. That was after the sale to Mrs. Mayer? A. Yes, sir."

### Opinion.

In the brief filed on behalf of plaintiff, we find the following:

"Upon his arrival there (i. e., upon the arrival of plaintiff to attend the meeting at the office of Pugh & Fullilove), he was shown a map and asked whether or not it correctly delineated the property sold by him to Wetherbee & Johnson, and by Wetherbee & Johnson to Brown, and, although plaintiff had no recollection of having seen the map, the testimony of the other witnesses who were present at the time leaves no doubt in the mind that the map was shown to him and that he has merely forgotten about it since, and that plaintiff did state, at the time, that the map represented the plantation sold by him to Wetherbee & Johnson and by them to Brown.

"It is further shown, however, and with equal certainty, that plaintiff stated that he had already recorded a deed of correction from himself to Wetherbee & Johnson, which deed correctly set forth the description of the property which he intended to convey; and it is also shown that, and again with equal certainty, plaintiff, at that time, did not know that the two lots which he is here claiming were located within the land delineated on the map."

It would then appear beyond dispute that, acting upon the advice of counsel, defendant rejected the title that was tendered to her, on the ground that it did not include all the land which was delineated on the map as that which she was to acquire, but that, upon the faith of plaintiff's assurances that he had intended to convey it all to his vendees, that he had corrected the description in the conveyance to Wetherbee & Johnson to make it so read, and that he would testify in the pending suit to compel them to make a similar correction in the deed to their vendee (who was to be plaintiff's vendor), together with the promise that one of plaintiff's vendees would make such correction voluntarily, she (defendant) then and there accepted the title which she would have, and had, otherwise rejected. It is true that plaintiff says that he did not know at the time that he gave those assurances that the lots now claimed by him were included in the land which he was thus, in effect, urging defendant to buy, and again his memory seems to have been sadly at fault, for he had in his possession the act by which he had acquired the lots and which describes them as being in the N. W. ¼ of section 5, and the whole of section 5 is plainly, even conspicuously, delineated on the map. Moreover, less than a year before, his attention had been called by one of his own correspondents, possibly a crediter holding a mortgage on the property, to the fact that, in the conveyance to Wetherbee & Johnson, three, of the four, "forties" intended to have been conveyed in the N. W. ¼ of section 5, had been omitted, and, after consultation with Wetherbee, he undertook to correct that error, and executed and recorded an instrument which is said to have had that purpose in view. The instrument does not, however, appear to have been shown to Wetherbee, or to any other party in interest; nor does it appear that it was known to any of them that plaintiff after declaring therein that the description "N. E. ¼ of the N. W. ¼" of section 5 was erroneous, further declared that—

"This intention was to describe the land in section 5 as the fractional northwest quarter of said section, being that portion acquired by him from Farm Land Company, but not including lots 6 and 7, bought from Thos. Caplis."

It is one thing however, for, a vendor to make a correction by adding something to that which he has sold, and quite another for him to assume to withdraw from the operation of a sale something which was included therein, or concerning the inclusion or exclusion of which there may exist a doubt. A contract ‾cannot be effectively construed by one of the parties, sitting as the sole judge and acting without the knowledge of the other.. The instrument thus executed and recorded by plaintiff was signed by him alone, and, so far as we are here informed Wetherbee had no reason to suppose that it contained anything more than a correction of the description by changing N. E. ¼ of N. W. ¼ to N. W. ¼. Brown does not appear to have been any better informed, since that was the only correction that he asked in his suit—being the suit in which plaintiff herein offered to give his testimony—and that was the correction that was made by the judgment in that suit, and it was in accordance with that correction that Wetherbee executed his correcting instrument and that Brown described the property in the sale to defendant. The stipulation in the instrument in question concerning the lots 6 and 7 can therefore, as it appears to us, serve but one purpose, which is, to suggest the idea that plaintiff considered that those lots formed part of the land which he had sold under the original description reading "and known as the 'Scopini place,'" and that he could thus withdraw them from that sale. If he did not entertain that idea, and they had not been thus included in the sale, there could have been no necessity, at that late day, for attempting to exclude them, as they could not have fallen into the sale if left alone. Reverting then to the question of plaintiff's knowledge of the location of the lots at the time of the meeting in the office of Pugh & Fullilove, it is evident that, though the other parties in interest may not have been aware of the attempted introduction into their affairs, or abstraction therefrom, of lots 6 and 7, plaintiff could not have been ignorant of that circumstance, since it was he who conceived and executed the performance, and yet we are gravely told that, within the year following, when he was called on to say whether or not he had any interest in the same section 5, which defendant was being urged to buy, he had entirely forgotten where his lots 6 and 7 were situated, and it is admitted that he assured defendant that he had intended to sell all the land delineated on the map, necessarily including the entire quarter section in question; that Brown's title was good, and, so far as he was concerned, that he had made it so by his correcting instrument, it being remembered that they were considering only the error in the use of the terms N. E. ¼ of N. W. ¼ of section 5, instead of N. W. ¼ of section 5, and that no one mentioned, and no one save the plaintiff knew or thought, of lots 6 and 7.

[1, 2] It is ordinarily impossible for one person to know what may be within the memory and knowledge of another, and, in assuming to determine a question of that kind in a given case, a judge must base his conclusion upon common experience, with normal individuals, unless it be shown that the individual whose knowledge or memory is at issue is abnormal. In the instant case, it is clear to us that plaintiff knew, or remembered, on April 22, 1911, when he executed his correcting instrument, that his lots 6 and 7 were, or might be, in the N. W. ¼ of section 5, and that he so knew or remembered on June 25, 1914, when he instituted this suit, and, finding nothing abnormal in that, we are constrained to hold that, as a normal individual, he was equally possessed of that information, during the interval between those dates, and particularly on or about March 1, 1912, when he assured defendant that he had no claim to assert to any land

in the quarter section thus mentioned; and, so holding, we are of opinion that having, by his assurances, induced defendant to invest her money in property which she would not otherwise have bought, he cannot now be heard to retract those assurances and recover that property upon the basis of a claim of which he was apprised when the assurances were given, and thereby place defendant in a worse position than she would have occupied if the assurances had not been so given and accepted.

Under our well-settled jurisprudence, where one stands by and sees his property sold under legal process, without making his claim known, or objecting thereto, he will be bound by the sale. Beach v. McDonough, 5 Rob. 352; Blanchard v. Allain, 5 La. Ann. 367, 52 Am. Dec. 594; Lippmins v. McCranie, 30 La. Ann. 1251.

A fortiori does that rule apply against one who, by his affirmative representations, induces under another to buy property to which he afterwards asserts a claim as owner.

It is therefore ordered and adjudged that the judgment appealed from be set aside, and that there now be judgment herein for defendant, rejecting plaintiff's demands and dismissing this suit at his cost.

DAWKINS, J., takes no part.